**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| RENEE GALLOWAY; and ISABEL DELEON, | : | |
| *on behalf of themselves and* | : | Case No. ___3:18cv540_____ |
| *all individuals similarly situated*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| PLAIN GREEN, LLC, and GREAT PLAINS | : | |
| LENDING, LLC, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Renee Galloway and Isabel Deleon ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants Plain Green, LLC and Great Plains Lending, LLC (collectively "Defendants"), they allege as follows:

## INTRODUCTION

1.      It is well established that Virginia's usury laws "are founded upon considerations of public policy." *Town of Danville v. Pace*, 66 Va. 1, 19 (1874). Even in an era where "state-by-state lobbying campaigns" have persuaded state legislators to reverse "nearly three hundred years" of prohibitions against "double- or even single-digit interest rate caps," Virginia has remained committed to its *longstanding* view that it is contrary to public policy to charge excessive interest rates to Virginians. Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 (2012) (providing historical context on usury laws). Virginia's strong public policy against excessive interest rates is

not only hammered home by its criminalization of such conduct, but its civil remedies are also severe for it has long been established that "[h]owever small amount of usurious interest contracted for, and however large amount of money loaned, *the contract is declared void, and the lender forfeits the whole amount of the debt and interest.*" *Brockenbrough's Ex'rs v. Spindle's Adm'rs*, 58 Va. 21, 32 (1866) (emphasis added).

2.      This case involves a criminal enterprise that was established with the intent of evading state usury laws. In an apparent attempt to insulate themselves from any legal liability, several individuals, including Kenneth Rees ("Rees"), established what is commonly referred to as a "rent-a-tribe" business model, where a payday lending scheme associates with a Native American tribe in an attempt to cloak itself in the privileges and immunities enjoyed by the tribe— or to at least create the illusion that it enjoys tribal immunity.

3.      To establish the rent-a-tribe scheme, Rees approached members of the Chippewa Cree Tribe and Otoe-Missouria Tribe (collectively the "Tribes"). Under the rent-a-tribe model, loans were made in the name of Plain Green and Great Plains—the tribal companies that served as fronts to disguise Rees and his companies' roles and to ostensibly shield the scheme by exploiting tribal sovereign immunity. In return for the use of their name, the Tribes received 4.5% of the revenue from the loans,[1] but otherwise the Tribes had no control over the income, expenses, or day-to-day operations of the businesses.

---

[1] Although the Tribe received 4.5% of the revenue on paper, these funds were diverted to tribal leaders such as Neal Paul Rosette and Billi Anne Morsette, the former "chief executive officers" of Plain Green who were sent to prison for accepting bribes in exchange for facilitating the award of tribal contracts and for helping another tribal member siphon over $55,000 in tribal monies, which were laundered through the predecessor company of Plain Green. The United States Attorney's Office, District of Montana, *Plain Green Officials Sent to Prison* (March 8, 2016), https://www.justice.gov/usao-mt/pr/plain-green-officials-sent-prison. As part of this investigation, the Montana Attorney General's office uncovered that Rosette, Morsette, and James Eastlick, Jr., each received $400,000 from a consulting company, Ideal Consulting, LLC, involved in the Plain

4.      This lawsuit challenges Plain Green and Great Plains' claim of sovereign immunity, who claim to be an "arm of the tribe" and thus protected by tribal immunity. Although the doctrine of tribal sovereign immunity protects the tribe itself, it does not automatically extend to economic subdivisions of a tribe, and the Court must determine whether these entities are "analogous to a governmental agency, which should benefit from sovereign immunity" or whether they are more like a "commercial business enterprise, instituted for the purpose of generating profits for [their] private owners." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010) (citing *Gavle v. Little Six, Inc.,* 555 N.W.2d 284, 293 (Minn. 1996)). In this instance, Plain Green and Great Plains are not entitled to sovereign immunity because 95.5%, if not more, of the profits from the scheme went to non-tribal participants and the companies were established for the sole purpose of evading state usury laws. Extending the protections of tribal immunity to Defendants' scheme would not serve the policies underlying tribal sovereign immunity.

5.      Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Defendants acted in concert and conspired with Rees and others to repeatedly violate state lending statutes resulting in the collection of an unlawful debt from Plaintiffs and the class members. Defendants are "persons" as defined in 18 U.S.C. § 1961(3), and the usurious debts they sought to collect and did collect are "unlawful debts" under 18 U.S.C. § 1961(6). Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962.

6.      Plaintiffs also assert a class claim for violations of Virginia's usury laws. Because the loans exceed 12% annual percentage rate ("APR"), such loans are null and void and neither

---

Green operation. *Id*. In other words, the Chippewa Cree Tribe actually received far less than the 4.5% allocated to it under the agreement.

the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. 15 U.S.C. § 1541(A). Accordingly, Plaintiffs and the class members seek to disgorge all amounts paid by Virginia consumers in excess of 12%, plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorneys' fees and costs. Va. Code § 6.2-305(A).

## JURISDICTION

7.      This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiffs are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

9.      Plaintiff Renee Galloway ("Galloway") is a natural person and resident of the Richmond Division.

10.     Plaintiff Isabel Deleon ("Deleon") is a natural person and resident of the Commonwealth of Virginia.

11.     Defendant Plain Green is a limited liability company doing business as an internet lending website under the domain name www.plaingreenloans.com. Plain Green claims to be a "tribal lending entity wholly owned by the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation, Montana, a sovereign nation located within the United States."[2] In return for a small fraction of the revenue, the Chippewa Cree Tribe allowed the lending scheme to use its name and

---

[2] Plain Green, *Home*, https://www.plaingreenloans.com/Default.aspx (last visited July 10, 2017).

falsely claim that it is operated by the Chippewa Cree Tribe. At all times relevant hereto, the Chippewa Cree Tribe did not participate in the day-to-day operations of Plain Green and did not fund the loans or handle the servicing or collection of the loans.

12.    Defendant Plain Green is a limited liability company doing business as an internet lending website under the domain name www.greatplainslending.com. Great Plains claims to be a "tribal lending entity wholly owned by the Otoe-Missouria Tribe of Indians, a sovereign nation located within the United States."[3] In return for a small fraction of the revenue, the Otoe-Missouria Tribe allowed the lending scheme to use its name and falsely claim that it was "wholly owned" and operated by the Otoe-Missouria Tribe. At all times relevant hereto, the Otoe-Missouria Tribe did not participate in the day-to-day operations of Great Plains and did not fund the loans or handle the servicing or collection of the loans.

## FACTUAL BACKGROUND

**A.    Longstanding Public Policy Prohibiting Usurious Loans.**

13.    More than forty years before the signing of the Declaration of Independence, Virginia enacted its first usury law, which capped interest rates at 6 percent. John W. Edmonds III, *Virginia Law of Interest and Usury*, 10 U. Rich. L.R. 77 (1975) (citing 4 Hennings Stat. 194).

14.    Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984).

15.    The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated,

---

[3] Great Plains, *Home*, https://www.greatplainslending.com/ (last visited July 10, 2017).

and the court should therefore be chary in permitting this policy to be thwarted." *Id*. (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

16.    In accordance with this longstanding public policy, a person may not charge an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A).

17.    The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders like Defendants. Virginia's licensing requirements include physical presence in the commonwealth and a minimum amount of liquid assets. Va. Code § 6.2-1507(A)(2). Additionally, before granting a license, the Commission must make specific findings concerning the applicant lender such as the character and fitness of the applicant and the applicant's knowledge of applicable Virginia laws and regulations. Va. Code § 6.2-1507.

**B.    Overview of Defendants' Enterprise.**

18.    Over the last decade, businesses have sought to evade state lending laws like Virginia's by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

19.    Rees recognized the exorbitant profits he could achieve by not complying with Virginia's usury laws and lending out high interest loans to some of Virginia's most vulnerable consumers. Indeed, prior to establishing the rent-a-tribe scheme described herein, Rees and the Affiliated Companies were participating in a "rent-a-bank" scheme.

20.     Under the rent-a-bank model, a payday lender who was prohibited from making loans in a particular state would evade a state's lending restrictions by partnering with a bank that would act as a conduit for the loan in exchange for a fee.

21.     Beginning in 2005, the Federal Deposit and Insurance Corporation began cracking down on rent-a-bank arrangements, and the rent-a-bank arrangements were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks.

22.     In response, Rees developed a solution—he decided to exploit Native American tribes as the new mechanism to continue the scheme. Ben Walsh, *Outlawed By The States, Payday Lenders Take Refuge on Reservations,* Huffington Post (June 29, 2015, updated Sept. 8, 2015), http://www.huffingtonpost.com/2015/06/29/online-payday-lenders-reservations_n_7625006.html ("But by 2010, various federal regulators had all but shut down the [rent-a-bank] arrangement. Rees needed a new way to keep his business alive. The solution he found was relatively straightforward: He'd work with Native American tribes . . . .").

23.     Like the rent-a-bank format, the loans would be originated in the name of a tribe, but the tribe would serve as nothing more than a nominal lender.

24.     In early 2011, Rees sent a letter to the Chippewa Cree Tribe proposing that they participate in the joint lending venture with his company, Think Finance, Inc.

25.     According to one tribal leader, "Think Finance made it clear to the Chippewa Cree that if the Tribe didn't accept Think Finance's terms, the company would be perfectly happy to find another tribe that would." *Id*. at 3.

26.     Within two weeks of receiving Rees' letter, the Chippewa Cree Tribe agreed to participate in the lending scheme and formed Plain Green. *Id*.

27.     Under the scheme, loans are made in the name of Plain Green, but Rees and the Affiliated Companies provide the infrastructure to market, fund, underwrite, and collect the loans, including the following services: lead generation, technology platforms, payment processing, and collection procedures.

28.     Pursuant to the initial contract between the various entities, Think Finance agreed "to license its software to the [Chippewa Cree] Tribe pursuant to a software license agreement acceptable to the parties" and to also "provide risk management, application processing, underwriting assistance, payment processing, and ongoing customer service support coterminous with the software license agreement." (Mar. 11, 2011 Term Sheet, attached as Ex. 1).

29.      Once the loan agreement was executed by a consumer, Plain Green immediately assigned the promissory note to GPLS for nothing of value.

30.     As compensation for serving as the front, the Tribe was paid 4.5% of the revenue received on the loans, reimbursed all expenses, and was advanced $50,000. *Id*.

31.     Other than the nominal fee paid to the Chippewa Cree Tribe, it otherwise had no control over the income, expenses, or day-to-day operations of Plain Green. Ben Walsh, *supra*, at 3 ("Like Think Cash before it, Plain Green makes small, short-term, high-interest loans to people all over the country who have no other source of credit. Although the company is nominally owned by the Chippewa Cree, the tribe has little actual involvement in its operations and receives a tiny fraction of the revenue generated by the business.").

32.     Shortly after entering into the rent-a-tribe arrangement with the Chippewa Cree Tribe, Rees contacted the Otoe-Missouria Tribe in Oklahoma, who agreed to participate in the lending scheme and formed Great Plains.

33.    Upon information and belief, the Great Plains enterprise is virtually identical to the structure of Plain Green.

34.    Thus, although Plain Green and Great Plains held themselves out as the actual lenders of these internet payday loans, Rees and the Affiliated Companies marketed, funded, collected the loans, and controlled the day-to-day operations and major business decisions of Plain Green and Great Plains.

35.    Upon information and belief, tribal members do not participate in the day-to-day operations of Plain Green or Great Plains and nearly all the activities associated with these companies occurred off the tribal reservations, such as the call centers, payment processing, and servicing of the loans.

36.    Most, if not all, activities performed in connection with these loans are performed by third parties who were not members of the Tribes or located on the reservations—often located in Georgia, Pennsylvania, and Texas. Ben Walsh, *supra* note 3, at 10.

37.    Indeed, the Plain Green Loan Agreement expressly instructed consumers to "mail each payment payable to Plain Green, LLC, Payment Processing, PO Box 42560, Philadelphia, PA 19101."

38.    Similarly, Great Plains' website instructs consumers to send payments to "PO Box 42906, Philadelphia, PA 19101." [4]

39.    Despite representations in the loan agreements that Plain Green and Great Plains were "wholly owned" and operated by the Tribes, Rees and the Affiliated Companies were the *de facto* owners and controlled the operations of the Plain Green and Great Plains.

---

[4] Great Plains, *Contact Us*, https://www.greatplainslending.com/about/contact-us (last visited July 10, 2017).

40.     Upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by Think Finance and Rees even though Plain Green and Great Plains concealed this information from consumers.

41.     Furthermore, neither Plain Green nor Great Plains ever accepted consumer payments after the loan agreement was executed.

42.     Rather, all payments went to GPLS—a Cayman company owned by Rees and others in order to avoid liability. GPLS then kicked back, at most, the 4.5% flat fee to the Tribes, but, upon information and belief, most of this money was siphoned for the personal benefit of certain tribal members, like Rosette, Morsette, and Eastlick.

43.     Additionally, Tailwind Marketing, LLC—another company owned by Rees—also handled the lead generation used to identify and solicit potential consumers.[5]

44.     Upon information and belief, pursuant to a Marketing Agreement, Tailwind Marketing handled the online and other advertisements for Plain Green and Great Plains.

45.     Similarly, pursuant to a Servicing Agreement, TC Decision Sciences—another company owned by Rees—participated in the enterprises as the website operator and software administrator for Plain Green and Great Plains.

---

[5] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. Pew Charitable Trust, *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/~/media/assets/2014/10/payday-lending-report/fraud_and_abuse_online_harmful_prac-tices_in_internet_payday_lending.pdf.     Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need or qualify for an additional loan. *Id.*

46.    As part of this role, TC Decision Sciences also handled customer service responsibilities, such as communications with consumers under the guise of Plain Green and Great Plains.

47.    Upon information and belief, TC Decision Sciences received $5 a month for each active account with Plain Green and Great Plains, and, again, this money ended up back in the pocket of Rees through his ownership interest in TC Decision Sciences.

48.    In the past few years, federal regulators have begun cracking down on rent-a-tribe arrangements.

49.    For example, the Attorney General for the Commonwealth of Pennsylvania brought an enforcement action against Rees and most of the entities named herein. *Pennsylvania v. Think Fin., Inc.*, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying Rees, Think Finance, and other defendants' motion to dismiss alleged violations of Pennsylvania and federal laws prohibiting usurious and illegal lending practices).

50.    The Pennsylvania Attorney General is not alone in its attention to this unlawful business model. For example, the United States Attorney for the Southern District of New York has indicted Scott Tucker and Timothy Muir, competitors of Defendants, for engaging in exactly the same unlawful-lending "rent a tribe" and collection practices alleged herein.

51.    The Tucker indictment, which sets out a strikingly similar set of facts, includes: (1) Mr. Tucker, through the use of shell companies, personally lent money to thousands of consumers through payday loans; (2) Tucker personally controlled virtually every aspect of the operations of these sham entities; (3) these sham entities shared employees, computer systems, and "other operating costs and infrastructure of a single lending business"; and (4) Mr. Muir acted as general

counsel for one of the Tucker entities. *United States v. Tucker*, Case No. 16-crim-091 (S.D. N.Y. Feb. 9, 2016) (Dkt. 1 at ¶¶ 1–3.)

52. For example, the indictment explains:

In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1–3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time. To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents. However, in truth and in fact, at all relevant times, and as TUCKER and MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

Similarly, to create the sham appearance that Tribes 1–3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers. TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

*Id*. at ¶¶ 23-24.

53. Just like the Tucker defendants, Plain Green and Great Plains' business relationship with the Tribes was nothing more than an attempt to shield non-tribal members' illegitimate businesses.

**C.    Defendants' Loans Charged Interest in Violation of Va. Code § 6.2-1541 and RICO.**

54. Defendants, together with other members of the Enterprise, marketed, initiated, and collected usurious loans in Virginia.

55.     Plaintiffs obtained loans in the amounts ranging from $300-$3,000 from Defendants.

56.     All loans offered by Defendants through Plain Green and Great Plains contained interest rates from 118% to 448%, if not higher.

57.     For example, Deleon's interest rate was 248.32%. (Nov. 11, 2016 Loan Agreement, attached as Ex. 2).

58.     Absent several exceptions, Va. Code § 6.2-1541 prohibits any person from making such loans to Virginians in excess of 12% APR unless that company has obtained a consumer finance license from the Commission. *See* Va. Code § 6.2-1501.

59.     Neither Defendants had a consumer finance license when they made the loans to Plaintiffs; nor did they ever attempted to obtain such a license.

60.     Under Va. Code § 6.2-1541(A), if a lender was not exempt from the provisions of those statutes and had not obtained a consumer finance license, yet nonetheless contracted to make a consumer loan and charged, contracted for, or received, interest, or other compensation in excess of 12% per year, then the loan is null and void, and the lender is not able to collect, obtain, or receive any principal, interest, or charges on the loan.

61.     Accordingly, Defendants' loans were null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs.

62.     Plain Green received no less than $7,847.00 from Galloway as a result of her illegal loans—all of which is recoverable under Virginia law. Va. Code § 6.2-1541(A)-(B).

63.     Great Plains received no less than $812.76 from Deleon as a result of her illegal loan—all of which is recoverable under Virginia law. Va. Code § 6.2-1541(A)-(B).

64.     Pursuant to Va. Code § 6.2-305(A), Plaintiffs and the class members are entitled to twice the total amount of interest paid on these loans.

65.     Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

66.     RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

67.     Defendants charged an interest rate far in excess of the enforceable rate established by Va. Code § 6.2-1541(A), and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

68.     As a result of Defendants' participation in the Enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT ONE:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

69.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

70.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia RICO Class"—initially defined as:

All Virginia residents who executed a loan with Plain Green or Great Plains.

Plaintiffs are members of the Virginia RICO Class.

71.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the profits generated by Defendants, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable

through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

72. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether the Plain Green and Great Plains participated in an enterprise under RICO; (2) whether the loans violated Va. Code § 6.2-1501 because the interest rates were too high; and (3) what is the proper recovery for Plaintiffs and the class members against each defendant.

73. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

74. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

75. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The

damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

76.    **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

77.    As alleged above, Defendants, along with other participants not yet known to Plaintiffs, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

78.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

79.     All of the loans made to Virginia residents and collected by Defendants included an interest rate far in excess of twice the enforceable rate in Virginia.

80.     This conduct began sometime as early as 2011, continues to date, and will be repeated again and again in the future to the detriment of Virginia consumers.

81.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by Defendants.

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

82.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

83.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

All Virginia residents who executed a loan with Plain Green or Great Plains.

84.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

85.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

86.    **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

87.    **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

88.    **Injunctive Relief Appropriate for the Class**.  **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the enterprise; and ordering the dissolution of each Defendant that has engaged in the enterprise.

89.    As alleged above, Defendants, along with other participants not yet known to Plaintiffs, violated § 1962(d) of RICO by entering into a series of agreements to violate § 1962(c), including the Term Sheet between the Chippewa Cree Tribe, Think Finance, GPLS and the contracts related to the services performed by Tailwind Marketing and TC Decision Sciences as part of their roles in the enterprise.

90.     As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE:
## VIOLATIONS OF VIRGINIA USURY LAWS
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

91.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

92.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

**Virginia Usury Class**: All Virginia residents who executed a loan with Plain Green or Great Plains where any interest was paid.

**Virginia Usury Subclass**: All Virginia residents who executed a loan with Plain Green or Great Plains where any interest was paid on or after August 7, 2016.

93.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

94.     Based on the estimated size of the class and the volume of loans offered by Defendants, Plaintiffs believe that the amount in controversy easily exceeds $5 million when considering the amounts repaid by Virginia borrowers, as well as the amount of outstanding debt that will be cancelled as part of the relief sought in this lawsuit. Settlements involving similar tribal lending enterprises have far exceeded $5 million, including a settlement recently approved by this Court. *See, e.g., Hayes v. Delbert Servs. Corp.*, Preliminary Approval Order, 3:14-cv-00258-JAG, Doc 193 (Jan. 30, 2017) (granting preliminary approval of a class action settlement that included

$9.43 million in compensation and forgiving $5.9 million in outstanding debt) https://secure.dahladmin.com/VACASH/content/documents/PreliminaryApprovalOrder.pdf;

Press Release, Office of Att'y Gen., Ga., Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender (Feb. 8, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40million-plus-settlement-online ($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and $500,00 attorney's fees and costs).[6]

95.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made by Defendants violated Virginia Code Section § 6.2-1501 because their interest levels were too high and (2) what is the proper recovery for Plaintiffs and the class members against each defendant.

96.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

---

[6] *See also* News Release, Attorney Gen. Pam Bondi, Fl., Attorney General Bondi and OFR Reach Multimillion Dollar Settlements with Online Lender (Jan. 12, 2017), http://myfloridalegal.com/__8525622-20065EE67.nsf/0/2F836464563D0EB5852580A60070-9370?Open&Highlight=0,western,sky ($11 million in compensation, $15 million in loan forgiveness, $500,000 civil penalty, $500,000 administrative fine, and $250,000 for costs); *Internet Lender CashCall, Inc. Barred from Doing Business in Minnesota*, Minn. Att'y Gen. Lori Swanson, https://www.ag.state.mn.us/Office/PressRelease/20160819InternetLender.asp (last visited May 24, 2017) ($11.7 million in monetary relief including a $4.5 million restitution fund).

97.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

98.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

99.    All of the loans made by Defendants to Virginia consumers used an interest rate greater than 12% and none of the exceptions to Va. Code § 6.2-303 apply.

100.    Accordingly, Plaintiffs and the class Members are entitled to recover from Defendants an amount equal to the total amount of interest paid in excess of 12% plus twice the

amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorney's fees and costs. Va. Code § 6.2-305(A).

## COUNT FOUR:
## UNJUST ENRICHMENT
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

101.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

102.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia Unjust Enrichment Class"—initially defined as follows:

> **Virginia Unjust Enrichment Class**: All Virginia residents who executed a loan with Plain Green or Great Plains where any amount of principal, interest, fees, or other charges were repaid.

103.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

104.    Based on the estimated size of the class and the volume of loans offered by Defendants, Plaintiffs believe that the amount in controversy easily exceeds $5 million when considering the amounts repaid by Virginia borrowers, as well as the amount of outstanding debt that will be cancelled as part of the relief sought in this lawsuit. Settlements involving similar tribal lending enterprises have far exceeded $5 million, including a settlement recently approved by this Court. *See, e.g.*, *Hayes v. Delbert Servs. Corp.*, Preliminary Approval Order, 3:14-cv-00258-JAG, Doc 193 (Jan. 30, 2017) https://secure.dahladmin.com/VACASH/content/documents/PreliminaryApprovalOrder.pdf (granting preliminary approval of a class action settlement

that included $9.43 million in compensation and forgiving $5.9 million in outstanding debt); Press Release, Office of Att'y Gen., Ga., Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender (Feb. 8, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40million-plus-settlement-online ($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and $500,00 attorney's fees and costs).

105.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

106.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

107.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the

members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

108.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

109.    All of the loans made by Defendants to Virginia consumers were void and unenforceable.

110.    Plaintiffs conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

111.    Accordingly, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Plain Green and Great Plains.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves

and the class they seek to represent against Defendants for:

A.      Certification for this matter to proceed as a class action;

B.      Declaratory, injunctive, and damages relief as pled herein;

C.      Attorney's fees, litigation expenses, and costs of suit; and

D.      Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By: _____*/s/ Andrew J. Guzzo*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
Elizabeth W. Hanes, Esq., VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com
Email: elizabeth@clalegal.com

*Counsel for Plaintiffs*